# BALTIMORE AND POTOMAC RAILROAD COMPANY *v.* MACKEY.

## ERROR TO THE SUPREME COURT OF THE DISTRICT OF COLUMBIA.

No. 84. Argued November 19, 20, 1894. — Decided March 4, 1895.

Where the evidence is conflicting, and no reasonable or proper inference can be drawn from it as matter of law, the case should be left to the jury.

Knowledge of a defect in a car brake cannot be imputed to the employé charged with keeping it in order, when he has had no opportunity to see it.

When an instruction to the jury embodies several propositions of law, to some of which there are no objections, the party objecting must point out specifically to the trial court the part to which he objects, in order to avail himself of the objection.

Ambiguous or too forcible expressions in a charge may be explained or qualified by other parts of it, and if the charge does not, as a whole, work injustice to the party objecting, the use of such expressions will not be cause for granting a new trial.

A railroad company, receiving the cars of other companies to be hauled in its trains, is bound to inspect such cars before putting them in its trains, and is responsible to its employés for injuries inflicted upon them in consequence of defects in such cars which might have been discovered by a reasonable inspection before admitting them to a train.

In an action by an executor of a deceased person against a railroad company

to recover damages for the killing of the intestate, an employé of the company, brought under the act of February 17, 1885, c. 126, 23 Stat. 307, which provides that "the damages recovered in such action shall not be appropriated to the payment of the debts or liabilities of such deceased person, but shall inure to the benefit of his or her family, and be distributed according to the provisions of the statute of distributions," it is not error to charge the jury that in estimating damages they may take into consideration the age of the deceased, his health and strength, his capacity to earn money as disclosed by the evidence, his family, who they are and what they consist of, and from all the facts and all the circumstances make up their minds how much the family would probably lose by his death.

*Pennsylvania Co.* v. *Roy*, 102 U. S. 451, distinguished from this case.

The plaintiff's declaration claimed $10,000. He obtained a judgment in the trial court for $8000. The appellate court affirmed this judgment, and ordered that he recover "as in his declaration claimed." *Held*, that these words did not have the effect of increasing the sum actually recovered in the special term, and that the inaccuracy was not sufficient ground for reversal.

THIS action was instituted under the provisions of the act of February 17, 1885, c. 126, 23 Stat. 307, to recover damages from the Baltimore and Potomac Railroad Company, because of the death of Robert A. Brown, an inspector and repairer of cars in its employ, which resulted from injuries to him, caused by his having been crushed between two freight cars of the defendant in the city of Washington, on the night of March 17, 1887.

There was evidence before the jury tending to show the following facts:

For about five years prior to his death, Robert A. Brown, the intestate of the defendant in error, was in the employment of the Baltimore and Potomac Railroad Company as a car inspector. In the evening of March 17, 1887 — the night being dark and, in the language of a witness, a "fearful" one, "snowing and the wind blowing very hard" — he was on duty in what is called the Jersey Avenue freight yard, in company with his uncle, who was also a car inspector. A fast freight train came in from Baltimore, and upon examination he discovered a defective drawhead (called by railroad men a "bull-nose") on one of the cars. The cars were all coupled together and it was, therefore, impossible to repair

the defective drawhead without the assistance of yardmen. Brown thereupon requested the yardmen to "cut" the train so that the defective drawhead could be reached and repaired. He and his uncle asked the conductor, Phillips, who had control of the shifting engine, to have that done — saying to him that if he would give them from five to seven minutes they would repair the car, and that if not repaired it would be pulled to pieces. Thereupon the conductor ordered a brakeman, with the yard engine, "to cut the train, and give them a chance to fix it." As soon as the train was cut, Brown and his uncle went to work on the defective car, which was the fifth one from the tender. The cut was between the fourth and fifth car. The deceased took the drawhead out and repaired it. Just as his uncle was about to drop the key in, which holds it together, he felt the cars "going away from him." He immediately came out from under the car and Robert A. Brown was "crushed in between the cars."

When the train of cars was cut, those attached to the engine were pulled forward, leaving a gap in the train. Notice was not given of any purpose after cutting the train to detach the engine from the four cars it pulled away in order that Brown and his uncle might reach and repair the drawhead. The two cars next to the one to be repaired were heavily loaded with coal. The grade from South Capitol Street to New Jersey Avenue was quite steep. While deceased was engaged in the work of repairing — his back being towards the engine that had been used to draw some of the cars away so that the inspectors could do their work — the engine was detached from the cars attached to it, and sent off on other duty. The result was, that the cars that had been attached to the engine came back down the grade towards the defective car, and against Brown and the car he was repairing. An effort was made to stop them by the use of a brake on one of the cars — a "foreign" car — but the brake was insufficient for that purpose, and was itself out of order and defective.

There was evidence tending to show that car inspectors were not expected or required to repair foreign cars. A car inspector testified: "There are cars that come into our yards

which are out of repair, and there are cars that come in there from other companies. Our company don't hold us responsible for fixing those cars, because we don't get paid for it. We are instructed not to use our materials unless it was for a broken drawhead, and then we would have to put in another drawhead. Sometimes we do work and card it to go to other companies. There are a great many cars come in that way, marked 'defective brake.' "

This witness also testified upon the question of the defective brake as follows: " He was a car inspector in the employ of the Baltimore and Potomac Railroad Company; that Robert A. Brown, the deceased, was the chief car inspector in the Jersey yard; that he was acquainted with a man named Downs, who was supposed to be the chief car inspector; that on the next day after the accident, or on the evening of the next day after the accident, the witness went, in company with Mr. Downs, to examine this car with the defective brake ; that he was not positive whether it was on the day after the accident, or the second day after the accident that they went to examine the said car with the defective brake; that he went with Downs to assist him to find the car; that they found it and made an examination of the brake, and that the result of the examination was that they found the brake was a defective one; that the car was marked 'defective brake' on the end of the car; that the witness got up on top of the car and tried both the top and end brake ; that he first put the brake down, and then came down and examined it, and found that the bottom connection was too short, and that 'if it had been a long connection, or connected all along, it would have been a pretty sufficient brake;' that this car was brought up from the Jersey yard during the night, or in the morning, along with a draft of eighteen or twenty or twenty-five other cars; that he did not know whether this car with the defective brake was hauled by another engine or was shifted backwards and forwards after the time of the accident or not; that the car was still loaded with oil; that chalk marks 'defective brake' were on the car when it got into the Maryland Avenue yard; that he did not know how the car got there; that he went with

Mr. Downs to examine this car at about half-past six or seven o'clock in the evening; that he examined the car with the defective drawhead shortly after the accident; that he saw the tools lying around there which were used for the purpose of fixing cars, and that he examined the drawhead and saw what it needed; that he told the men to look out for him, and he got under the car and did the work; that it took him about three minutes." On cross-examination, he further said "that he did not know that the brake which he examined was the brake on the car connected with the accident, except that he was told that that car was the cause of the accident; that he did not know it as a fact; that Robert A. Brown was his superior officer — 'our leader' — or foreman in the yard; that he, witness, first discovered the chalk mark 'defective brake' when he went to examine the car; that it was marked on the end of the car, and on both sides."

After the train was cut, and space left between the cars that were pulled away and the defective car, Brown had no reason to believe that the former would be allowed to run back upon him. On the contrary, when the train was cut he had the assurance of the conductor that the cars pulled ahead would be left standing where they were after the cutting of the train had been accomplished.

The conductor, a witness for the defendant company, gave this account of the affair: " He was in the employ of the defendant, the Baltimore and Potomac Railroad Company, as a conductor in the freight yard in this city; had been so employed by the defendant in this freight yard for about twelve years; was there at the time of the accident, running with the shifting engine No. 327; that on the night of the 17th of March, 1887, the night of the accident, he was engaged in the 'Jersey yard' in shifting cars; that they got down to the Jersey yard about 9.55 o'clock in the evening, and took down with them about twenty-five cars, which they first shifted around where they belonged; that it took them about half an hour to dispose of those cars; that they went over on to the other side of the yard to shift the fast freight which was coming in from the North; that said train was brought in by engine No.

307 and placed on No. 1 track; that said fast freight train arrived after they got down to the Jersey yard about ten or fifteen minutes; that they went to work upon said train to get out such cars as were to go South on the fast freight; that there were not over six cars in the said freight train to go South; that the cars which were for Washington were put over on another track; that then Robert A. Brown, the deceased, told them that they had a broken bull-nose down there which he wanted to fix; that he asked the witness to pull the cars apart, and witness told him that he would go down there and pull them apart; that he went down there and pulled the cars apart; that witness told deceased he was not going to shift any more of those cars; that said cars were pulled apart to a distance of about forty feet; that brakeman Hillary pulled the pin and uncoupled the cars in the first instance, and that the witness ordered the cars to be cut loose; that at that time he was talking to Robert A. Brown, who was standing right where the cut was made; that after the pin was pulled the witness (Phillips) gave the signal to pull ahead, and then went up towards the engine; that he stopped the engine when Robert A. Brown, the deceased, said, 'That will do,' by giving the engineer the shut-off signal with his lamp by swinging it; that thereupon the engineer (Smith) called to him, and he went up towards the engine; that the engineer then said he had no more water to do any shifting with, and I told him I hadn't anything to do, and they were not going to do any more shifting on that train, and I asked him to take a load of stock from the lower end up to the warehouse and stop at Sixth Street and get water. He said: 'Well, I will try it.' So I said to brakeman Teiling, when I stopped talking to the engineer, 'How is it?' He said, 'All O. K.' I said, 'Go up and set this brake.' He got up and put it on. I told Mr. Brown, after I pulled the cars apart, that I was going to leave them standing there."

There was evidence tending to show that a full crew, with a shifting engine, in a yard is six men, an engineer, a fireman, a conductor, and three brakemen; and that on the night Brown was killed there were only two brakemen on the train.

There was also evidence bearing upon the question whether the deceased was guilty of contributory negligence in not displaying a blue light while repairing the defective drawhead, in conformity, as the defendant claimed, with one of the printed rules of the company.

*Mr. Enoch Totten* for plaintiff in error.

I. The defendant was not guilty of negligence. If the brake was defective, which is not conceded, it was not the fault of the defendant. The defendant had employed a skilled and reliable man to inspect all cars and discover all defects, and this servant was on the ground at the proper time and actually inspected the train. So far as this case is concerned, this is all the law required the defendant to do.

A corporation must necessarily act through its agents. It was the duty of the plaintiff in error to employ a skilled man, or a man reputed to be skilful in the business, to inspect and repair its cars. When it had done this it had performed its whole duty as master.

II. The deceased was guilty of negligence.

The motion made by the counsel for the defendant at the close of the whole testimony should have been granted and a verdict directed in favor of the defendant, for the reason that the evidence plainly showed negligence on the part of the deceased.

The deceased himself had been directing the movements of the cars which afterwards struck him, and told the conductor of the switching engine to pull them away, and when this was done he immediately went between the two trains and proceeded to work on the stationary portion of the train with his back towards the cars which had been moved. The night was very dark, a snow-storm was raging with a violent wind blowing, and the three cars were on a steep grade. He knew that the cars were to be left where they had been stopped by his order, and that they were heavily laden. He must have known that there was great danger in the position in which he had placed himself. He neglected to display his blue

lights; this was gross carelessness and a plain violation of the rules and regulations of the company and of his special orders. If he had displayed a blue light, as he was bound to do, before beginning his work on the train, no injury could have occurred to him. The conductor undoubtedly supposed that the deceased would wait until the engineer had got away with his engine, and that he would then hang out his lights for his own protection. If he had displayed them at once, the conductor would have known he was at work and would have been guided in his movements by the rules and regulations. The deceased was thus doubly guilty of negligence. He carelessly placed himself in a place of danger, and the consequences cannot be charged to the defendant. *Southern Pacific Co.* v. *Seley*, 152 U. S. 145; *Elliott* v. *Chicago, Milwaukee &c. Railway*, 150 U. S. 245; *Tuttle* v. *Detroit &c. Railway*, 122 U. S. 189; *Railroad Co.* v. *Houston*, 95 U. S. 697; *St. Louis & San Francisco Railway* v. *Schumacher*, 152 U. S. 77.

There is another aspect of this case which was disregarded by the court on the trial. The plaintiff's intestate was employed, and it was his business, to deal with broken and disordered cars. He must, therefore, be held to have knowledge of the broken brake, whether he actually knew its condition or not. It appears that he did actually make at least a partial inspection, as he discovered the broken bull-nose, which he undertook to repair. He should have discovered the broken brake, if it was broken. The car with the alleged broken brake was within two car-lengths of the broken bull-nose. Although it is ordinarily the duty of railroad companies to furnish reasonably safe appliances, cars, and machinery for their employés, and in default thereof they are liable for injuries resulting from such default, yet this rule of law does not apply to cases where employés and servants of railroad companies are engaged in repairing damaged cars. By his employment to handle damaged cars the deceased assumed the risk incident to the enhanced danger of this service, and the law presumes that he was paid for it. *Yeaton* v. *Boston & Albany Railroad*, 135 Mass. 418; *Tuttle* v. *Detroit &c.*

*Railway, supra; Chicago & Northwestern Railway* v. *Ward,* 61 Illinois, 130; *Flannagan* v. *Chicago & Northwestern Railway,* 45 Wisconsin, 98.

In the next place, if this accident was caused by the carelessness of the trainmen in charge of the work of switching cars in the yard, then the plaintiff cannot recover, because such trainmen were *fellow-servants* of the deceased. This has been settled recently by this court in the case of *Northern Pacific Railroad* v. *Hambly,* 154 U. S. 349. See also *Randall* v. *B. & O. Railroad,* 109 U. S. 478; *B. & O. Railroad* v. *Baugh,* 149 U. S. 368; *Tuttle* v. *Detroit &c. Railway,* 122 U. S. 189; *Quebec Steamship Co.* v. *Merchant,* 133 U. S. 375; *Bunt* v. *Sierra Bate Co.,* 138 U. S. 483; *District of Columbia* v. *McElligott,* 117 U. S. 621; *Murphy* v. *N. Y. Cent. R. R. Co.,* 11 Daly, 122; *Baltimore Elevator Co.* v. *Neal,* 65 Maryland, 438; *Besel* v. *N. Y. C. & H. R. Railroad,* 70 N. Y. 171; *Smith* v. *Potter,* 46 Michigan, 258; *Columbia & Xenia Railroad* v. *Webb,* 12 Ohio St. 475; *Mackin* v. *Boston & Albany Railroad Co.,* 135 Mass. 201.

III. At the close of the evidence the plaintiff's counsel requested two instructions, which were objected to by the defendant's counsel; they were granted by the court. They constitute the errors claimed in the 5th and 6th bills of exception (33, 34).

The criticism on these declarations of the law of the case is (1) that it is not for the plaintiff to object (he being in the place of the deceased in this suit), that the defendant failed to exercise reasonable care in keeping the brake in repair. It employed Brown himself, who was a proper man for that duty, to examine this brake and to repair it if it was in bad order. Having employed a competent man for that purpose, it did its whole duty. If there was negligence as to this brake, the negligence was the negligence of Brown. (2) Each of these instructions wholly ignores the important question of contributory negligence.

IV. The plaintiff having failed to prove negligence on the part of the defendant's other servants, he could not, under the pleadings, recover on the ground that the accident was caused

by a defective brake. Mention of a defective brake will not be found in the declaration.

It was error to depart from the theory of the case set out in the declaration. The case was made to turn, on the trial, on the question as to whether or not the brake used to hold the three detached cars was defective or in bad order. This was not the case made by the plaintiff in his declaration; the pleadings exclude that view of the case.

Putting out of sight for the time the fact that the deceased was the person employed to discover and repair broken brakes, it will be observed that the court ignored the law as applicable to *foreign* cars. The evidence that this car with the alleged defective brake was a foreign car was very slight; but what there was, if any, went to the jury.

A different responsibility is connected with such a car. A railroad company receiving a loaded car from another company is entitled to presume that such car had been properly constructed of suitable material, and had passed the inspection of some one of ordinary skill in such matters, and was reasonably fit for the use to which it was devoted when received. *Ballou* v. *Chicago, Milwaukee &c. Railway*, 54 Wisconsin, 267; *Mich. Cent. Railroad* v. *Smithson*, 45 Michigan, 212; *Smith* v. *Patten*, 46 Michigan, 258; *Baldwin* v. *R. R. Co.*, 50 Iowa, 680; *Davis* v. *Detroit & Milwaukee Railroad*, 20 Michigan, 105; *Mackin* v. *Boston & Albany Railroad Co.*, 135 Mass. 201.

V. The trial judge, in the oral instructions in reference to the duty of the corporation as to keeping brakes in good order, utterly ignored the distinction between *warranting* the good order and fitness of the brake for the service at all times, and exercising reasonable care and diligence in keeping it in good order.

It will be observed that the court impressed it upon the minds of the jury that the defendant was bound to see to it that this brake was in good working condition and sufficient to hold those three cars at the time. This was holding the defendant to a higher degree of care than the law requires. The rule is thus stated by this court in *Washington & Georgetown Railroad* v. *McDade*, 135 U. S. 554, 570: " Neither individuals

nor corporations are bound, as employers, to insure the abso-
lute safety of the machinery or mechanical appliances which
they provide for the use of their employés.  Nor are they
. bound to supply the best and safest or newest of those appli-
ances for the purpose of securing the safety of those who are
thus employed.  They are, however, bound to use all reason-
able care and prudence for the safety of those in their service
by providing them with machinery reasonably safe and suitable
for the use of the latter." .

VI.  The trial justice also erred by instructing the jury that
they might consider the "strength" of the deceased, in refer-
ence to his capacity to earn money; there was nothing in the
evidence to show whether he was a strong man or otherwise.

The court also erred in the oral instructions to the jury on
the subject of damages.  The learned judge told the jury that
they should take into consideration in estimating damages
"his family — who they were and what they consist of."
This instruction directed the jury to consider, first, who were
the family, or, which is the same thing, what was the condi-
tion in life of his family, and, second, of what age and sex
were the children.

The court has recently passed upon this question, and con-
demned a like ruling.  *Pennsylvania Company* v. *Roy*, 102
U. S. 451.

*Mr. Franklin H. Mackey* for defendant in error.

Mr. Justice Harlan, after stating the case, delivered the
opinion of the court.

This suit was instituted under the act of Congress approved
February 17, 1885, c. 126, 23 Stat. 307, providing:

"Sec. 1.  That whenever, by an injury done or happening
within the limits of the District of Columbia, the death of a
person shall be caused by the wrongful act, neglect, or default
of any person or corporation, and the act, neglect, or default is
such as would, if death had not ensued, have entitled the party
injured, or, if the person injured be a married woman, have

entitled her husband, either separately or by joining with the wife, to maintain an action and recover damages, the person who or corporation which would have been liable if death had not ensued shall be liable to an action for damages for such death, notwithstanding the death of the person injured, even though the death shall have been caused under circumstances which constitute a felony; and such damages shall be assessed with reference to the injury resulting from such act, neglect, or default, causing such death, to the widow and next of kin of such deceased person: *Provided*, That in no case shall the recovery under this act exceed the sum of ten thousand dollars: *And provided, further*, That no action shall be maintained under this act in any case when the party injured by such wrongful act, neglect, or default has recovered damages therefor during the life of such party.

"SEC. 2. That every such action shall be brought by and in the name of the personal representative of such deceased person, and within one year after the death of the party injured.

"SEC. 3. That the damages recovered in such action shall not be appropriated to the payment of the debts or liabilities of such deceased person, but shall inure to the benefit of his or her family, and be distributed according to the provisions of the statute of distributions in force in the said District of Columbia."

The assignments of error in the brief filed by the plaintiff in error are seven in number, and cover all the material points in the case. We assume that any exceptions taken at the trial and not embraced by those assignments have been abandoned.

1. The first assignment of error is that the court below erred in refusing at the close of all the evidence to direct a verdict in favor of the defendant. It need only be said that the case was one peculiarly for the jury under proper instructions as to the law of the case. There was no reasonable or proper inference from the evidence, as matter of law, that would have justified the withdrawal of the case from the jury. *Phœnix Ins. Co.* v. *Doster*, 106 U. S. 30, 32; *Del. & Lackawanna Railroad* v. *Converse*, 139 U. S. 469, 472; *Texas and Pacific Railway* v. *Cox*, 145 U. S. 594, 606.

2. The second assignment relates to the granting, on plaintiff's request, of the following instructions:

" The jury are instructed that the employés of a railroad corporation have a right to expect that the corporation will, as far as possible, provide for their protection in moving its trains sufficient machinery in good order and condition, and that it will exercise reasonable care and caution not to use cars in its trains having defective brakes; if, therefore, the jury believe from the testimony that the brake set by the brakeman Teiling was defective at the time of the accident, and that by the exercise of reasonable care and caution the defendant could have known said brake to be defective, then it is liable, and their verdict must be for the plaintiff, provided they believe from the testimony that the accident was caused by reason of said defective brake.

" The jury are instructed that if they believe from the evidence the brakes set by brakeman Teiling as detailed in the evidence would, if then in good order, have prevented the cars from moving, or at least would have tended to retard such movement so as to have given sufficient time to notify Brown of his danger and to have enabled him to escape, then if the jury believe from the evidence that the brake was not in good order at the time of the accident, and, further, that the defendant by the exercise of reasonable care could have known of its defective condition, their verdict must be for the plaintiff."

Two objections have been made by counsel in this court to those instructions.

The first one is that the railroad company employed the deceased himself to examine the brake in question, and to repair it if it was not in proper condition; that if the defect was chargeable to the negligence of any one it was to his negligence; and that the above instructions ignored the questions of his contributory negligence.

There was no evidence whatever tending to show that Brown was guilty of negligence in not having discovered, immediately upon the arrival of the train, or before he was killed, that the brake was defective or insufficient. The proof did not show at what time it became defective, or that the

car on which it was placed had ever before been in Washington. As soon as he observed a defective drawhead in one of the cars — which was soon after the train arrived at the company's yard — he set about to repair it, and while engaged in that particular work was killed. He had, therefore, no opportunity, after the train reached the yard, to investigate the condition of the brakes, and, consequently, the issue as to the defectiveness of the brake in question was made by the court to depend upon the inquiry whether due care was taken by the railroad company, represented by agents or employés other than Brown, in providing proper appliances on its cars. And that was the theory upon which the company itself proceeded in its defence, as is apparent from one of the instructions asked by it in these words : "Unless the jury shall be satisfied from the evidence that a defect in the brake which was set by feiling on the stock car just before the accident was the sole cause of the injury to Robert A. Brown, the plaintiff's intestate, and that said brake was in such defective condition at the time the said stock car was by the defendant put into its train, the plaintiff cannot recover, and the burden of proof is upon the plaintiff to show, by evidence satisfactory to the jury, that said brake was in such defective condition before said car was by the defendant put into the said train."

It is not an objection to the instructions given on motion of the plaintiff that they were silent on the question of contributory negligence. The defendant did not ask any specific instruction on that point. Nevertheless the court when it charged the jury, said, upon that subject, all that was necessary : "Make up your mind, first, within the instructions of the court, was this defendant negligent? was that a bad brake? if it had been a good one, would it have held this train? If you say the brake was all right, that ends the case. If you say that it was not all right, and that a good brake would have held the car, then the next question is, was the plaintiff's intestate himself negligent, imprudent, or careless, contributing to the injury directly? And if so, the plaintiff could not recover. If not, he could recover."

The next objection urged by the defendant, in support of its second assignment of error, is that the words "as far as possible," in the first of the above instructions, imposed upon the railroad company a higher degree of care in selecting and keeping in order its appliances and machinery than the law requires. It may be observed that the objection to the instruction containing the particular words complained of was general in its nature. The instruction embodied some propositions of law to which no objection could be properly made, and it was the duty of the defendant to point out, specifically, the part of the instruction which it regarded as announcing an erroneous principle of law. But we need not put our decision entirely upon this ground; for it is clear that the jury could not have been misled by the use of the words "as far as possible." The instruction in which those words are found distinctly informed the jury that the law imposed upon the company the duty of exercising "reasonable care and caution." And in its charge to the jury the court said: "Was that brake in proper reasonable condition? If it was not in a proper, reasonable condition, did the cars roll back in consequence of that infirmity? Was the accident traceable to that? I will say here, gentlemen, that if you should be satisfied, from the evidence in this case, that this brake was in a reasonably good condition, in good ordinary repair, and there was nothing wrong about it, then the plaintiff cannot recover, because that would end the case." Again: "So you see, gentlemen of the jury, the only question, so far as the negligence of the defendant is concerned, is, was the brake defective, out of order, not in reasonable repair, not reasonable for the occasion, and if not, was such fact the cause of the accident, or did it materially or directly contribute to it?" Taking the instructions and the entire charge of the court together, it is manifest that the jury understood the words "as far as possible" — if they thought at all of mere words — to mean "as far as possible," *exercising reasonable care and caution.*

In *Rogers* v. *The Marshal*, 1 Wall. 644, 654, Mr. Justice Davis, speaking for the court, well observed that "a nice criti-

cism of words will not be indulged when the meaning of the instruction is plain and obvious, and cannot mislead the jury." And in *Evanston* v. *Gunn*, 99 U. S. 660, 668, Mr. Justice Strong said: " Sentences may, it is true, be extracted from the charge which, if read apart from their connection, need qualification. But the qualifications were given in the context, and the jury could not possibly have been misled." And so in *Tweed's case*, 16 Wall. 504, 516: " Courts are not inclined to grant a new trial merely on account of ambiguity in the charge of the court to the jury, while it appears that the complaining party made no effort at the trial to have the point explained." See also *The Sybil*, 4 Wheat. 98.

What the court said to the jury, in respect of the point now under consideration, was in harmony with the principles announced in *Hough* v. *Railway Co.*, 100 U. S. 213, 218, where it was said that a railroad corporation was under an obligation " to provide and maintain in suitable condition the machinery and apparatus to be used by its employés — an obligation the more important, and the degree of diligence in its performance the greater, in proportion to the dangers which may be encountered." Again, in the same case : " To guard against the misapplication of these principles, we should say that the corporation is not to be held as guaranteeing or warranting the absolute safety, under all circumstances, or the perfection in all its parts, of the machinery or apparatus which may be provided for the use of employés. Its duty in that respect to its employés is discharged when, but only when, its agents whose business it is to supply such instrumentalities exercise due care as well in their purchase originally as in keeping and maintaining them in such condition as to be reasonably and adequately safe for use by employés." See also *Northern Pacific Railroad* v. *Herbert*, 116 U. S. 642; *Washington & Georgetown Railroad* v. *McDade*, 135 U. S. 554, 569.

3. The third assignment of error is that the case was tried on the theory that the accident was attributable to a defective brake, contrary to the case made by the declaration. We do not find in the record any specific exception upon which

this assignment is based. But if there were one, it could not avail the defendant. It was alleged in the declaration that "by reason of the negligence and default of the defendant, its servants, agents, and employés," the car on which the deceased was working "was run into by another of the defendant's cars whereby the plaintiff's intestate, by collision of the said cars, was so crushed and injured that death immediately followed." Whether these allegations were or were not sufficient to allow proof that the collision was the result of a brake so defective that it could not control the cars which ran back against the deceased and killed him, we need not stop to consider, because both parties asked instructions upon the theory that the jury were to inquire as to the defectiveness of the brake. An instruction asked by the defendant, and which is given above, involved the inquiry by the jury whether the defectiveness of the brake, if it existed, was the sole cause of Brown's death. Another instruction asked by it assumed that the condition of the brake was a matter to be inquired of by the jury. That instruction was as follows: "If the jury shall find from the evidence that the injury to Robert A. Brown resulted solely in consequence of some defect in the brake set by Teiling on the open or stock car next to the engine and tender, and that said stock car was not the property of the defendant, but belonged to another railroad company, and had been, the same evening and a short time prior to the accident, brought to the defendant's yard, in Washington, in a freight train, with the brake in such defective condition, then the fact (if the jury shall so find the fact) that such injuries did so result cannot be considered as evidence to support the charge of negligence against the defendant, and the defendant is entitled to the verdict." So that no error was committed in submitting to the jury the question whether the brake was defective, and whether that defect, if found to be the cause of Brown's death, could have been discovered by the exercise of due care.

4. The fourth assignment of error was the refusal of the court "to give the two instructions asked by counsel for the defendant in respect to the degree of care required as to for-

eign cars." The instructions referred to are those above given.

The first of the two instructions asked by the defendant, so far as it related to this subject, was properly refused becau<sup></sup> it restricted all liability of the defendant for the defective brake to the time when the car on which it was placed was put into its train; in other words, as the court below well said, if the brake was plainly shown to have become broken while on the trip from Baltimore to Washington, there would, according to the defendant's instructions, be no liability whatever upon it for an injury arising from the use of the defective brake after the car reached its yard in the latter city. That view cannot be approved.

The question as to the duty of a railroad corporation to take due care that foreign cars hauled by them shall be in such condition as to be safely handled by its own employés, was carefully considered by the court below. Mr. Justice Hagner, after observing that the great through trains, especially of freight cars, are composed of cars belonging to different roads, the proportion of such cars belonging to the particular road over which they are passing being very small, said : " They come from all portions of our country, and often from Canada and Mexico. They are transported along each successive road for hire, and only for that consideration. The employés of such road are obliged to handle every car in the train in the same manner, without respect to its ownership, and are exposed to the same dangers from defects of construction or mechanical appliances that may attend the management of the cars belonging to the road that employs them. It would be most unreasonable and cruel to declare, that, while the faithful workman may obtain compensation from a company for defective arrangement of its own cars, he would be without redress against the same company if the damaged car that occasioned the injury happened to belong to another company."

The same question arose in *Gottlieb* v. *N. Y. & Lake Erie Railroad*, 100 N. Y. 462, 467, 469, which was an action by a brakeman to recover for personal injuries received by him

while he endeavored, in obedience to orders, to couple two
cars that had broken apart in the night time while under way.
It appeared that the cars were not provided with proper
bumpers, and the absence of such bumpers was the cause of
the injuries inflicted upon the brakeman.   The Court of Ap-
peals of New York said : " The defect was an obvious one,
easily discoverable by the most ordinary inspection, and it
would seem to be the grossest negligence to put such cars into
any train, and especially into a train consisting of cars of dif-
ferent gauge.   But these two cars did not belong to the
defendant.   They belonged to other companies, and came to
it loaded, and it was drawing them over its road to their
destination.   They were in good repair, and the defects were
in their original construction, they being just as they were
originally made.   The defendant claims that it was bound to
receive and transport these cars over its road, and was under
no responsibility for any defects in their structure, and that
the plaintiff, upon entering its employment, assumed all risks
from such defects."   After a review of some of the cases,
the court proceeded : " It will thus be seen that the utterances
of judges as to the responsibility of one company for the de-
fective cars of another company drawn over its road are not
entirely harmonious, and we think all the authorities hold that
the company drawing the cars of another company over the
road owes, in reference to such cars, some duty to its em-
ployés.   It is not bound to take such cars if they are known
to be defective and unsafe.   Even if it is not bound to make
tests to discover secret defects, and is not responsible for such
defects, it is bound to inspect foreign cars just as it would
inspect its own cars.   It owes the duty of inspection as master,
and is at least responsible for the consequences of such de-
fects as would be disclosed or discovered by ordinary inspec-
tion.   When cars come to it which have defects visible or
discoverable by ordinary inspection, it must either remedy
such defects or refuse to take such cars ; so much at least is
due from it to its employés.   The employés can no more
be said to assume the risks of such defects in foreign cars
than in cars belonging to the company. . . . The rule

imposing this responsibility is not an onerous or inconvenient or impracticable one. It requires, before a train starts, and while it is upon its passage, the same inspection and care as to all the cars in the train."

In a later case — *Goodrich* v. *N. Y. Central & Hudson River Railroad*, 116 N. Y. 398, 401, — the same principle was announced, the court saying: " It was decided in *Gottlieb* v. *N. Y., L. E. & W. R. R. Co.*, 100 N. Y. 462, that a railroad company is bound to inspect the cars of another company used upon its road, just as it would inspect its own cars ; that it owes this duty as master, and is responsible for the conquences of such defects as would be disclosed or discovered by ordinary inspection ; that when cars come in from another road which have defects, visible or discernible by ordinary examination, it must either remedy such defects or refuse to take them. This duty of examining foreign cars must obviously be performed before such cars are placed in trains upon the defendant's road or furnished to its employés for transportation. When so furnished the employés whose duty it is to manage the trains have a right to assume that, so far as ordinary care can accomplish it, the cars are equipped with safe and suitable appliances for the discharge of their duty, and that they are not to be exposed to risk or danger through the negligence of their employer."

The defendant, in one of its requests for instructions, assumed what the law will not sanction, that the defendant was under no duty to ascertain the condition of cars belonging to another company which constitute a part of its train, and which are to be handled by its employés.

We are of opinion that sound reason and public policy concur in sustaining the principle that a railroad company is under a legal duty not to expose its employés to dangers arising from such defects in foreign cars as may be discovered by reasonable inspection before such cars are admitted into its train.

5. The fifth assignment relates to so much of the charge of the court as is set forth in the thirteenth and fifteenth bills of exceptions. It is sufficient to say that the exception, in each instance, was in gross to a series of propositions, some of

which, at least, were clearly right. Neither exception can be regarded. *Beaver* v. *Taylor*, 1 Wall. 637; *Moulor* v. *Am. Life Ins. Co.*, 111 U. S. 335, 337; *Conn. Life Ins. Co.* v. *Union Trust Co.*, 112 U. S. 250, 261; *Burton* v. *West Jersey Ferry Co.*, 114 U. S. 474, 476.

6. The sixth assignment of error relates to the following part of the charge to the jury : "Now, manifestly, you cannot estimate in dollars and cents exactly what the damages are in a case of this kind, if there be any at all. That is not possible. But you may and you should take into consideration the age of the man, his health and strength, his capacity to earn money as you discover it from the evidence, his family — who they are and what they consist of — and then, gentlemen, from all the facts and all the circumstances, make up your mind how much this family, if anything, probably lose by his death, and that would be how much had this family a reasonable expectation of receiving ; how much had they a reasonable expectation of receiving while he lived, if he had not been killed."

It is suggested by counsel that this charge was in conflict with the decision of this court in *Pennsylvania Co.* v. *Roy*, 102 U. S. 451, 459, which was an action to recover damages for personal injuries caused by the negligence of the defendant. It was there said : "There was, however, an error committed upon the trial, to which exception was duly taken, but which does not seem to have been remedied by any portion of the charge appearing in the bill of exceptions. The plaintiff was permitted, against the objection of the defendant, to give the number and ages of his children — a son ten years of age, and three daughters of the ages, respectively, of fourteen, seventeen, and twenty-one. This evidence does not appear to have been withdrawn from the consideration of the jury. It certainly had no legitimate bearing upon any issue in the case. The manifest object of its introduction was to inform the jury that the plaintiff had infant children dependent upon him for support, and, consequently, that his injuries involved the comfort of his family. This proof, in connection with the impairment of his ability to earn money, was well calculated to

arouse the sympathies of the jury, and to enhance the damages beyond the amount which the law permitted; that is, beyond what was, under all the circumstances, fair and just compensation to the person suing for the injuries received by him. How far the assessment of damages was controlled by this evidence as to the plaintiff's family it is impossible to determine with absolute certainty, but the reasonable presumption is that it had some influence upon the verdict."

The question of damages in the present case must be determined by the special statute under which the plaintiff sued and not by the general, recognized principles in the law of torts. In *Roy's case* the plaintiff himself was the party injured. He sued for compensation in damages for the personal injuries he received. Here, death ensued from the wrongful act of the defendant. So the jury found. And the plaintiff is the personal representative of the party injured. The statute giving the remedy expressly excludes the creditors of the deceased from any interest in the recovery, and declares not only that the judgment shall inure exclusively to the benefit of his family, but that the damages, not exceeding ten thousand dollars, shall be assessed " with reference to the injury " done " to the widow and next of kin of such deceased person." Under such a statute, it is entirely proper that the jury should take into consideration the age of the deceased, his health, strength, capacity to earn money, and family. The injury done to a family consisting of a widow and helpless young children, who depended for support entirely upon the labor of a husband and father whose death was caused by the wrongful act of others, is much greater than would be done to any " next of kin " able to maintain themselves and who have never depended, and had no right to depend, upon the labor or exertions of the deceased for their maintenance.

7. The seventh assignment of error is that the judgment of the general term, affirming the judgment of the special term, was erroneous in declaring that the plaintiff recover " as in his declaration claimed." The judgment in the special term was for eight thousand dollars. Although the amount claimed in the declaration was $10,000, the affirmance of the judgment

of the special term is necessarily limited to the amount of the judgment so affirmed; and the words "as in his declaration claimed," carelessly put into the final order of the general term, cannot have the effect to increase the sum actually recovered in the special term. If the attention of the general term had been called to the form of the judgment it would have been put in proper shape. Such an inaccuracy in form is not sufficient ground for reversal. The judgment to be enforced is the one rendered in the special term.

We perceive no error in the record to the prejudice of the defendant, and the judgment is

*Affirmed.*