EDISON PHONOGRAPH WORKS v. GOODWIN MFG. CO.†

(Circuit Court of Appeals, Third Circuit. May 19, 1911.)

No. 19.

PRINCIPAL AND AGENT (§ 174*)—RATIFICATION OF AGENT'S ACTS—QUESTIONS FOR JURY.

In an action against a corporation on a contract made by an agent, which defendant denied having authorized or ratified, proofs adduced by plaintiff showing a contract, receipt by defendant of goods delivered thereunder to the value of $12,000, and payment therefor, and refusal by defendant to receive further shipments, made out a prima facie case, the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Motion for rehearing denied October 9, 1911.

evidence being such that the authority of the agent to make the contract and its ratification by defendant might be inferred therefrom; and whether such prima facie case was overcome by evidence adduced by defendant was a question for the jury, and not for the court to determine as a matter of law.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 725; Dec. Dig. § 174.*]

In Error to the Circuit Court of the United States for the District of New Jersey.

Action at law by the Goodwin Manufacturing Company against the Edison Phonograph Works. Judgment for plaintiff, and defendant brings error. Affirmed.

McCarter & English, for plaintiff in error.

Collins & Corbin (Gilbert Collins and Edward S. Robert, of counsel). for defendant in error.

Before BUFFINGTON and LANNING, Circuit Judges, and YOUNG, District Judge.

BUFFINGTON, Circuit Judge. In the court below the Goodwin Manufacturing Company, a citizen of Missouri, brought suit against the Edison Phonograph Works, a citizen of New Jersey, to recover damages for breach of contract. The case was tried and a verdict rendered in favor of the plaintiff. On entry of judgment thereon against the defendant, it sued out this writ. The question involved is whether the court erred in refusing to give the jury binding instructions for the defendant.

We have had the benefit of a most thorough discussion of the evidence by counsel, and it has undergone the subsequent careful examination by the several members of this court. They all unite in the conclusion that the learned judge would have erred had he withdrawn this case from the jury; for even where the facts are undisputed, but are of such a nature that reasonable men can fairly draw different inferences therefrom, the law makes the jury, and not the judge, the agency to determine what inference shall be drawn. The facts in the present case make it peculiarly one for the application of that rule. Without undertaking to recite the entire facts we content ourselves with referring only to sufficient to justify the conclusion that the case was one for submission to a jury.

The contract for the breach of which this suit was brought was as follows:

"St. Louis, Mo., May 17, 1907.

"Goodwin Manufacturing Co., 3332 Choteau Ave., St. Louis, Mo.—Gentlemen: Following a contract at present in existence, we would ask you to begin on October 8, 1907, to supply us with two car loads of your usual high-grade stearic acid every ten days, for two years or twenty-four months from above date. The governing feature shall be 7 cents per pound above the price of (prime New York tallow in tierces or barrels) f. o. b. Orange, N. J. The paying conditions shall be net cash upon receipt of invoice and shipping documents. The market price of tallow shall be determined by Stillwell & Gladding, of New York City, the first business day of every month, and that price shall be the basis to govern shipments of stearic acid from your plant

for the ensuing month. Should you not be able to deliver the stearic acid, owing to fires, accidents, strikes, or contingencies beyond your control, this contract shall be temporarily suspended until your plant can be in operation again, and then the stearic acid due on the unfilled time of contract shall be supplied.

"Yours truly,                         Edison Phono. Works,
                              "[Signed]   J. H. Moran, Purchasing Agent.
    "Accepted:
        "Goodwin Mfg. Co.,
            "Geo. F. Tower, Jr., Pres.
    "Attest:
        "Minnie O. Turner."

The Edison Company was engaged in making phonograph records. Stearic acid is a basic substance in such records, and at the date of this contract the Edison Company was using about 90,000 pounds per week. This contract was, therefore, for about one-third of its contemplated needs. About the time the contract was made the Edison Company became apprehensive about obtaining a supply of stearic acid. There were only four or five makers of it in the country, the output of some of them had not proved reliable, and a failure to obtain a supply would necessitate a shutting down of work by the Edison Company. The Goodwin Company had for some time been furnishing stearic acid to the Edison which had proved satisfactory, and were also then under contract, dated April 24, 1907, which provided for furnishing 20 car loads. It further appears that by some process peculiar to themselves the Goodwin Company was able to manufacture such acid through the summer months, which fact enabled them to keep up a constant supply. In this very serious state of affairs Mr. Gilmore, the general manager, and Mr. Moran, the purchasing agent, respectively, of the company conferred and as a result Moran went to St. Louis where the Goodwin Company operated, to see what could be done, while Gilmore went to Europe on business of the company, which kept him there until the fall. On May 3d Moran wrote the Goodwin Company requesting shipment of some acid, and saying:

"We earnestly trust you will be able to follow it up with regular weekly shipments until our present requisition is completed."

Stating he would call on them at St. Louis on May 13th or 14th, he added:

"I am very anxious to look over your plant, particularly that portion which enables you to make stearic acid in warm weather."

On May 15th the Goodwin Company wrote the Edison Company a letter, which was received by the latter in Moran's absence, and which called attention to Moran's visit and its general purpose, as follows:

"We had the pleasure of a call from your Mr. J. H. Moran, and who is still in the city. We have discussed present and future stearic acid business with your company, and trust we may continue our pleasant business without interruption."

Following this the contract in suit was negotiated and executed in duplicate by Moran and the president of the Goodwin Company on May 17, 1907. It will be noted that Moran by this contract did not

commit his company for two years to a fixed price, but agreed that the price should follow that of the tallow market, tallow being the ingredient which fixed the price of stearic acid. By this contract he secured for his company at future market price and of assured quality about one-third of their contemplated consumption. This contract was, under then existing conditions, so clearly for the advantage of the Edison Company in its contemplated operations that reasonable men might infer that in a large manufacturing concern's course of business its purchasing agent was impliedly authorized to make it. As the fulfillment of this contract by the Goodwin Company necessitated the use of their entire stearic acid facilities at St. Louis and involved further outlays at New Orleans, Mr. Tower requested Mr. Moran on his return home to have his company confirm the contract. On May 23d the Goodwin Company received a telegram, dated Orange, N. J., signed Edison Phonograph Works, saying, "Mailed requisitions to-day covering contract made seventeenth inst. between Tower and Moran," which was followed by a requisition of that date, No. 12,580, for "2 car loads of stearic acid every 10 days for 2 years from Oct. 8, 1907; all terms in accordance with contract entered into on the 17th inst. between Mr. Tower and our Mr. Moran," and signed "Edison Phonograph Works, per W. E. Gilmore, F. E., General Manager."

The depression of business that followed the making of this contract delayed the fulfilling of the contract of April 23, 1907, No. 12,085, until the spring of 1908. On April 3, 1908, the Goodwin Company began shipping and invoicing under requisition No. 12,580 covering the contract in suit. Shipments and invoices by that number, 12,580, were made on April 3, 1908. $3,870.57; April 27, 1908, $3,-991.54; and May 28, 1908, $3,842.20—and the goods were billed at a higher price than under requisition No. 12,085. These shipments were paid for by voucher checks approved and signed by general executive officers. Requisitions under the contract not coming to the Goodwin Company for further shipments, the correspondence shows the Goodwin Company began to complain, and on July 7, 1908, the Edison Company, in a letter signed by Moran, wrote:

"We regret very much that we are again compelled to advise you that we cannot use any stearic acid at the present time. We have stopped shipments from all sources, and do not know when we will be able to have them resumed. We regret that you have a car made up, but must ask you to hold it until our stock is reduced. Our requirements are practically nothing, and we have upwards of 125 tons in stock. Of course, a year ago this quantity would appear insignificant, but present conditions make it look prodigious. We will keep you informed as to the phases of business, and hope that in the very near future we will be able to report that it has an upward tendency."

On September 24th the Goodwin Company wrote as follows:

"We are very much dissatisfied with the condition of affairs relative to our contract with you for supplying you with stearic acid. When we made this contract with your Mr. Moran, we went to considerable expense in equipping our plant, so as to get the stearic acid out as you wished, and we have not shipped a half dozen cars since that time, on contract made over a year ago. * * *"

This letter brought out from the Edison Company the statement the company had never known of the contract in suit, that Moran had not informed the company of it, and that it had never been ratified by any officer thereof. It subsequently appeared that the name of the Edison Company to the telegram of ratification had been signed by Moran, and the requisition No. 12,580 had not been signed by Gilmore, who was in Europe at the time, but was signed and initialed "F. E." by a clerk named Evans, by directions of Moran. Of all these facts the Goodwin Company had no knowledge. To avoid apparent ratification by the acceptance and payment of $11,704.51 of invoices under requisition No. 12,580, the Edison Company averred that the invoices were not received and paid for under requisition No. 12,580, but were mistakenly accepted under No. 12,085, to which it was replied that such could not have been the case, because the invoices in question under No. 12,580 were at a higher price than No. 12,085 provided for, and that the summary of indorsements on the latter invoice showed it had already been filled before the invoices on No. 12,580 were received. ,

Now, it seems to us clear that the proofs adduced by the plaintiff showing a contract, ratification by receipt and payment of substantially $12,000 of goods delivered under such contract, and a refusal by the defendant to receive further shipments, made out a prima facie case which entitled the plaintiff to go to the jury; and where a prima facie case is made out and a defendant adduces proof to overcome it, the question whether it has overcome it is for the jury. Under these proofs there certainly was evidence from which a jury could infer authority on the part of Moran to make this contract, and from which they could infer the company had ratified it. The evidence was not such that but one inference could be drawn therefrom, and upon such inference the court could as a matter of law hold the defendant was not answerable on the contract. The authorities are abundant that the duty to submit is imperative in such cases. Thus in Baltimore v. Mackey, 157 U. S. 83, 15 Sup. Ct. 494, 39 L. Ed. 624, it is said:

"It need only be said that the case was one peculiarly for the jury under proper instructions. There was no reasonable or proper inference from the evidence, as a matter of law, that would have justified the withdrawal of the case from the jury."

And in Texas Co. v. Cox, 145 U. S. 606, 12 Sup. Ct. 909, 36 L. Ed. 829:

"The case should not have been withdrawn from the jury, unless the conclusion followed, as a matter of law, that no recovery could be had upon any view which could be properly taken of the facts the evidence tended to establish."

Other than its action in constituting and holding out to the public of Mr. Moran as its purchasing agent, there was no proof of any action of the company through resolution of its board authorizing such purchasing agent, or, indeed, any one else, to purchase its manufacturing supplies. The purchases of stearic acid from the Goodwin Company had theretofore been made by Moran. The latter and Gilmore were the only officials of the company who consulted about the supply of stearic acid, and while there is no evidence that any express authority

was conferred on Moran to contract for a supply thereof from the Goodwin Company, yet in view of the fact that the Edison Company was gravely concerned as to obtaining a supply, that Gilmore and Moran were the only ones who consulted about it, that Gilmore was just leaving for Europe for an absence which extended over several months, that he left no directions with Moran to consult with any one about such supply in his absence, and in view of the fact that Moran was given the title of purchasing agent, and as such he had contracted with the plaintiffs before, and indeed, the company was now taking a several months' supply contracted for by Moran, it would seem the jury had before it facts from which they would infer that Moran had authority to purchase. For ten years he had acted as purchasing agent, and during that time he alone had purchased all the raw material used in the business. Indeed, it was not unreasonable for a jury to say, if Moran was not the purchasing agent of the company, why was he given that title? If he was not the agent to purchase, what was he agent to do? And if he was not authorized to purchase, who was? for the directors had expressly authorized no one to do so.

At any rate the facts were such that the jury was the tribunal to make the inference, for certain it is that under such facts no court would be justified in saying as a matter of law that a purchasing agent had no authority to purchase a partial supply of an essential, basic element of manufacture, where the purchase was made in entire good faith, and in a way that automatically fixed the price and covered such a proportionate supply in time and quantity as it was not unreasonable for a general purchasing agent to providently provide for. Indeed, one cannot read this evidence without being impressed with the conviction that, had the times and business continued as prosperous as they were when this contract was made, there would have been no effort on the part of the defendant company to avoid it, and if they had taken that stand there could have been no escape from its obligation by the Goodwin Company. The case was patiently heard by a painstaking trial judge, and after a careful study of the whole evidence, and of all the numerous questions raised, we are firm in our conviction the facts are such as compelled its submission to the jury, and the evidence of damage warranted the amount found.

Our conclusion is in accord with the views of the trial judge, who, in an opinion denying a new trial, aptly said:

"* * * The main contentions on behalf of the defendant are that the case should have been withdrawn from the jury; in other words, that the evidence submitted by the plaintiff was insufficient, in any of the several aspects mentioned in defendant's brief, to entitle the plaintiff to a verdict, or, again, if there were sufficient evidence for that purpose, that the verdict is excessive. These considerations do not, however, commend themselves to my judgment. I am still convinced that the case was one for the jury, and that it was for them, and not for the court, to say whether or not, under the evidence, the defendant was obligated to respond to the plaintiff in damages. The verdict compels and has my approval."

The judgment below will therefore be affirmed.