Henry W. Lengyel, J.
This is an action for personal injuries, pain and suffering and wrongful death. On April 5, 1962 while a patient at S.t. Lawrence State Hospital, a mental institution owned and operated by the State of New York, Donald B. Lawrence suffered .severe personal injuries .and, it is alleged that as a result of said injuries he died on September 30, 1963, while a patient at another State institution, Marcy State Hospital.
Initially, on June 28, 1962, Donald B. Lawrence brought claim against the State of New York, by his attorneys, Main, Poissant and Twiiss, for personal injuries, pain and suffering and medical expenses. Subsequently, on May 15, 1964, Helen P. Lawrence, widow of the .said Donald B. Lawrence and administratrix of his estate, by her attorney, E. Stewart Jones, Esq., brought claim against the State of New York for her husband’s alleged wrongful death. Limited letters of administration were issued to Helen P. Lawrence on January 28, 1964. At the opening of trial the claimant, Helen P. Lawrence was permitted to consolidate both of the above claims and to amend the title of .the consolidated claims to “ Helen P. Lawrence, as Administratrix of the Hoods, Chattels and Credits of Donald B. Lawrence, deceased”. E. Stewart Jones, Esq., was substituted as attorney in the place and .stead of Main, Poissant and Twiss. Both claims were timely filed and neither claim has been assigned or submitted to any other court or ¡tribunal.
Proof presented to the court indicates that for some weeks prior to March 12, 1962, the said Donald B. Lawrence had been in a confused and upset state of mind. On March 12, 1962, he was committed to St. Lawrence State Hospital pursuant to an order of certification by the Surrogate of Franklin County, New York. The petition for the certification of mental illness contains the .statements of two physicians to the effect that the deceased’s mental illness was characterized by depression, destructiveness, suicidal tendencies, delusions and hallucinations with particular emphasis on the factor of suicidal tendencies. The ward admission record of St. Lawrence State Hospital states that the deceased’s reported tendencies were “ suicidal, *758 disturbed, depressed ’ The clinical notes for said deceased stated “ Pt. has known suicidal, disturbed, depressed tendencies ” (italics as in said notes). The mental examination made on the deceased’s admission to “ H ” ward in the State hospital states that his behavior was ' ‘ very delusional, hallucinates, hostile, evasive, suicidal and destructive ’ ’. The mental examination made by Dr. Fredman, a staff psychiatrist, on March 14, states in part: ' ‘ He has no insight into his condition and his judgment is impaired ’ ’ and on March 19 he was diagnosed, schizophrenia, paranoid type.
There is no question that the hospital authorities were well aware of this patient’s suicidal tendencies.
St. Lawrence State Hospital follows what is known as the “open door policy” in mental institutions. As testified by Dr. Brown, Assistant Director, this means, among other things, that all bars or grates have been taken off all windows except the window to the drug room. Mr. Lawrence, on admission, was placed in Ward “ H ”, a maximum security ward of the hospital. The maximum security was effected by having a greater number of attendants for the ward population than in the regular wards and a more intensive use of tranquilizing drugs. However, because this patient’s medical history and X rays indicated a possibility of active tuberculosis he was transferred on March 16 to Pritchard Pavilion where he was placed in isolation in a single room on ithe second floor of the building. Pritchard Pavilion is a three-story building which was used at that time for mental patients, as well as hospital employees, with physical medical problems. It was under the supervision of a Dr. Gogolak who testified there were about 80 patients in the building on April 5, 1962, and that he had about 6 nurses and some attendants to assist him in the supervision of the patients in this building. The exact number of nurses and attendants on duty on April 5 was not made clear but there is absolutely no question that the deceased was given merely sporadic supervision despite the fact that the hospital authorities knew he had suicidal tendencies. The room which he occupied was, as previously stated, on the second floor approximately 12 feet above ground level. It had a window which had a fly screen on the lower half of the window, said screen being able to be moved up and down on metal channels. On the morning of April 5 this patient was found on the ground about 5 or 6 feet from the building wall and under the window of his room. There was a depression in the ground near his head and he was semiconscious and incoherent. The *759 screen to .said window was pushed out from the bottom. There was a large amount of blood splashed on the floor of said room between the door and the window. No one .saw the deceased jump or fall from his room. However, the circumstantial evidence amply warrants the conclusion that the deceased jumped from his room striking the ground initially with the top of his head. (Boyce Motor Lines v. State of New York, 280 App. Div. 693, 696, affd. 306 N. Y. 801; Markel v. Spencer, 5 A D 2d 400, affd. 5 N Y 2d 958.)
The question basic to our consideration of this case is whether the State exercised a degree of care which, under all the facts presented, was reasonable to protect the deceased from the consequences of his own acts.
The “ open door policy” which is followed to ,some degree by almost all of the State mental institutions, except at those for the criminally insane, was discussed at length by the psychiatric experts for both the State and the claimant. These experts were in substantial agreement as to the great benefit derived from such a policy but were not in agreement as to the totality with which such a policy should be administered. This particular State hospital was operated as a 100% “open door policy” hospital. The court agrees with the claimant’s expert wherein he stated: “ However, I don’t believe in 100% open door policy. As a matter of fact, I have grave doubts about 100% of anything.” We further agree with the claimant’s phychiatrist wherein he stated: “In my opinion, I have no question about the man’s illness or medical supervision but I do question the physical environment. I am of the opinion that any patient who by his behavior or by observation who indicates tendencies dangerous to himself or other people should be protected as far as possible from .self-injury or injuring other people. This particular patient with his background and isolation in a room where a window is available * ° * that could be opened easily and without guards allowing him to jump out, I don’t think commensurate with the best or I would say even accurate \sic] psychiatric care. ”
The following language from Gioia v. State of New York (22 A D 2d 181, 185) is applicable to the present situation: “Assuming knowledge that a patient’s mental imbalance or disturbed psyche is such that suicidal proclivity either has been demonstrated or can be reasonably anticipated and foreseen, a duty arises to frustrate that which is likely or foreseeable by the exercise of at least ordinary and reasonable care. * * * A combination of notice of suicidal tendency and lack of proper supervision of a person about whose sanity *760 there is doubt and who shortly thereafter kills himself * * * should result in liability in accordance with the well-established principles of negligence law, including the important element of foreseeability (Santos v. Unity Hosp., 301 N. Y. 153; Martindale v. State of New York, 269 N. Y. 554; Wilson v. State of New York, 14 A D 2d 976; Daley v. State of New York, 273 App. Div. 552, add. without opinion 298 N. Y. 880’ * * *).”
There is nothing in the record which would indicate that the hospital authorities had made a reasoned medical appraisal of this patient which led to the conclusion that he was no longer subject to suicidal tendencies or other hallucinatory disorders. Placing such a patient in' a room on the second floor of a hospital building without a protective gate or bars on the window and with inadequate supervision was in our opinion negligent conduct on the part of the State which was the proximate cause of the injuries sustained by this patient leading eventually to his death. (Daley v. State of New York, supra; Szostak v. State of New York, 20 A D 2d 828; Herold v. State of New York, 15 A D 2d 835; Zajaczkowski v. State of New York, 189 Misc. 299.) The deceased was no,t proven to have been contributorily negligent. (Latourelle v. New York Cent. R. R. Co., 301 N. Y. 103; Noseworthy v. City of New York, 298 N. Y. 76.)
As a result of the accident of April 5 the deceased sustained a fracture dislocation of the C-7 and D-l vertebrae resulting in paraplegia. He was transferred from the St. Lawrence State Hospital to the House of the Good Samaritan, Watertown, New York, where he remained as a patient from April 5,1962 through April 6, 1963 when he was discharged to the Veterans’ Hospital at Syracuse, New York. He was discharged from the Veterans’ Hospital to Marcy State Hospital on September 26, 1963 and died on September 30, 1963.
While at the House of the Good Samaritan the deceased was placed in Crutchfield tongs for a period of six weeks and then in a cervical collar. As his condition did not improve a myelography was performed which demonstrated an obstruction at cervical 7. Thereafter a cervical laminectomy was carried out at the cervical 7 level. While at said hospital he had recurrent pulmonary infections. He was given intensive physiotherapy but his neurological status did not change and he was unable to move his lower extremities. ■
According to the death certificate (Exhibit 8) the cause of death was “ pulmonary embolism bilateral ” with “ paraplegia ” listed as another condition causing death. We find that the *761 paraplegia was a competent producing cause of the pulmonary embolism which was the direct cause of death. We, therefore, find that the said Donald R Lawrence died as a result of the accident which occurred on April 5, 1962.
We find that the deceased left a widow and two children, ages 11 and 2, respectively. We further find that the deceased, prior to his commitment to St. Lawrence State Hospital, drew a government pension for a service-connected disability, i.e., tuberculosis, and also was self-employed and brought home approximately $20 to $25 a week. As nothing was presented to the court relative to the cessation of the government pension it must be assumed same continued after his death. We also find that the deceased had a life expectancy of 28.18 years. We believe it to be implicit in the record the deceased would have had periods of remission when he would have rejoined his family, had he lived. However, he would not have been, monetarily, a particularly productive member of society.
As was stated in Dimitroff v. State of New York (171 Misc. 635, 639-640): “ * * * you may and you should take into consideration the age of the man, his health and strength, his capacity to earn money, as you discover it from the evidence, his family * * * and then, gentlemen, from all the facts and all the circumstances, make up your mind how much this family, if anything, probably lose by his death, and that would be how much this family would have a reasonable expectation of receiving. How much had they a reasonable expectation of receiving while he lived, if he had not been killed. ’ While, at best, the measure of damages must be somewhat indefinite, it must be confined and limited to the reasonable expectation of the pecuniary loss.” (See Baltimore & Potomac R. R. v. Mackay, 157 U. S. 72, 92; see, also, St. Pierre v. State of New York, 272 App. Div. 973.) The medical and hospital bills amounted to $11,984.84 and the funeral expense to $1,161.50.
It is our opinion that the claimant, Helen P. Lawrence, administratrix of the goods, chattels and credits of Donald It. Lawrence, is entitled to a judgment against the State of New York in the amount of $25,000 for the conscious pain and suffering of the decedent pursuant to sections 119 and 120 of the Decedent Estate Law, and to an additional sum of $15,646.34 as the pecuniary loss suffered by the widow and children, plus the medical, hospital and funeral expenses. Said sum of $15,646.34 is with interest from September 30, 1963, to March 30,1964 and from May 15,1964 to the date of entry of judgment herein (Decedent Estate Law, § 132).
*762 The motions to dismiss made at the end of claimant’s case and at the close of the trial, upon which decision was reserved, are denied.
The parties hereto shall have 10 days from the receipt date of this decision in which to submit proposed findings of fact which, if submitted, shall be marked in accordance with this decision and the requirements of CPLR 4213; if not submitted, they will be deemed waived. Let judgment be entered accordingly.